The General Assembly of the United States of America appeals in the 4th and 7th constitutional circuit. Hear ye, hear ye, hear ye! All persons having business in the 4th and 7th constitutional circuit are required to Good morning all. Our first case for argument this morning is United States v. De La Torre et al. And we'll call upon Mr. Hillis first. Mr. Hillis, can you hear me? Loud and clear, Judge. Thank you for letting me appear by phone. Yes, my first inquiry, Mr. Hillis, is in your motion for today, there was no statement with regard to the position of the defendant, your defendant, in connection with the seating of time. Is that, have you cleared that with him?  Thank you, Your Honor. From my perspective, I'm in the position of arguing I'm sorry, Judge. From my position, it appears that I'm faced with the unpleasant prospect of arguing a claim that would be deemed frivolous in light of the court's recent development by way of the Chater and Flores decision, so I'd be tasked with merely preserving the issue on appeal. I've laid out why we think that Chater is incorrect in the reply brief, but I would have nothing to add, and that's the reason I was seating my time. So you don't wish to make any other statement or representation regarding the law of the facts in the time allotted to you this morning? No, sir. Unless the court has questions of me, I think everything is adequately laid out in the briefs. And I wanted to seat the time to my counsel for co-defendants so that they could use that to advance their issues, given that I've said all I thought I could say. Well, I just want the record to be clear that time has been allotted to you to make any statement on behalf of the defendant. So if in the course of this argument this morning you have anything further to say, I don't want to interrupt any other counsel's position. I would like you to tell me if that's a potential for you after you hear the others argue this morning. I'll be standing by, Your Honor. I doubt that I'll have anything to add, but I appreciate that. All right. Well, what I will do at the conclusion of the arguments on behalf of the other defendants is afford you some time if you wish to make any other statement. All right? Thank you, Judge Blum. Okay. All right. Moving on from Mr. Hillis to Ms. Masters. Good morning, Your Honor. Just to ask a time question, is Mr. Hillis then seating his time back to us? Well, I'm accepting his representation that he's seating time. I'm not going to cut anybody off on time. Okay. What my statements this morning were with regard to being absolutely sure that Mr. Hillis is in no way limited in any oral presentation with regard to his defendant. So the time that he has seated, you have. Okay. All right? Thank you, which I think was seven minutes and then one on rebuttal. Well, I have down here that you had planned to argue for four minutes. So now you're taking Mr. Hillis's four minutes? He had my records indicate that there had been an argument set for four minutes for you, four minutes for Mr. Hillis, with one minute for rebuttal. Okay. Well, that was not what we originally were intending to do when he seated his time. So, but let me, I can just speak. I'm going to start with the premise that you have eight minutes. Okay. Thank you. All right. So this morning I'm representing Mr. Rush and then also co-defendant Kristen Chapman on the issue regarding their entitlement to have their pleas vacated because they were based upon the mistaken assumption that prior convictions under Indiana law qualified as felony drug offenses under Section 851. Ms. Eisenman is separately going to address the Illinois issues as to Mr. Chapman. Under the plea agreements, the government agreed to notice one prior offense under Section 851, thereby reducing the defendant's mandatory minimum sentence from life to 20 years. That was the reason they accepted the pleas. The government does not dispute that plain error occurred if Indiana criminalizes a broader category of methamphetamine than state, than federal law. And if that is the case, the court should vacate the pleas. Ms. Masters, you, in your arguments to the court, in your briefing, you lumped Mr. Chapman and Mr. Rush's prior Indiana convictions together. And it seems to me that they are separate and distinct and there are maybe stronger arguments for one of them rather than the other. Why did you lump those together? One is Mr. Rush's prior conviction is possession of meth and Mr. Chapman's is possession of a Schedule II controlled substance. Well, because methamphetamine is defined the same, regardless of the offense, and that is why we lumped them together. Regardless of the offense, the methamphetamine, under the categorical approach, defines, is under Indiana law, all isomers, whereas federal law is just optical isomers. So I don't believe there's any distinction between them, nor has the government argued there is one. And under the categorical approach in Elder, in the circuit, that breadth and differentiation disqualifies the predicate offenses, regardless of whether they're possession or, and Schedule II includes meth. Does the possession of meth statute define meth for that as pure or adulterated meth, as opposed to including the isomers that the possession of a controlled substance does? It seems that they are different between Mr. Chapman's prior Indiana conviction and Mr. Rush's. Well, we do not believe they are different. Ms. Eisenman can answer a more specific question. We believe that they are controlled by the definition of the substance, and the substance, be it pure or unadulterated meth, is still about the isomers, and there's a difference in how the courts define, how the state and federal courts define isomers. And under that difference, none of those prior offenses qualify as predicates. The statute for possession of meth, again, says possessing meth, methamphetamine, pure or adulterated. How, for Mr. Rush's conviction, how are you bringing in the isomer definition under that statute? I understand how you're bringing it in under the controlled substances conviction of Mr. Chapman, but how does it come in for Mr. Rush? Because, again, it's a different statute. Your Honor, we believe that that relates to pure or adulterated still relates to the definition of meth in the statute as including isomers, and that is our position. So, in fact, we still believe that there's a broader federal, a broader state statute than federal, and for that reason it disqualifies the offense as a predicate, and there's also a Category 2 offense as to Mr. Rush as well, so certainly on those they match. But that one wasn't used for the enhancement purposes under the plea, was it? It could be. It wasn't? It was not. I mean, the other thing I would point out to the Court at this point is that the government has not raised that argument. So it has been waived on their end to the extent that there is some difference. They have not raised that challenge themselves. So we think that that is not a relevant point at this point in time and that the offenses should be that they should be able to vacate the plea. So I'm going to preserve the rest of my time for rebuttal. Okay. May it please the Court. Vanessa Eisenman on behalf of Christian Chapman. This Court's recent decision in the Jara-Rodriguez v. Barr dictates the outcome of Mr. Chapman's appeal. Unlike Mr. Rush, two of Mr. Chapman's three 851 predicates arose under Illinois Section 402C. The government's only opposition to Mr. Chapman's argument that those two 851 predicates under Illinois 402C do not qualify is that their assertion that Section 402C is divisible and therefore the modified categorical approach applies. Is that something we can address since those were not used as part of the plea to enhance his sentence? Yes, absolutely you can because the relevant question is what was he looking at at the time he made his plea? And at the time he made his plea, he never would have agreed to 25 years had he not thought that the government could have filed for three 851 predicates without the plea agreement. Right. These arguments are before us in the context of a claim that the pleas were not knowing and voluntary because we're dealing with appeal waivers for three of the defendants in this case that would ordinarily require dismissal of the appeals. But because the arguments are couched in terms of involuntary and unknowing entry of the guilty pleas, because of this misunderstanding that everybody apparently was operating under about the mismatch between the state definition and the federal definition of meth, the pleas could not have been known involuntary. So, I mean, there are several steps in the order of file here. That's exactly right. There are several steps. I was focused on the Illinois one because that's, I think, our quickest path for Mr. Chapman to victory because two out of his three, again, arose under that statute. We have this clear holding from this court that that statute is not divisible. That's the only thing that the government came forward with as to why those two would qualify. And without those two, even if this court found that the Indiana predicate qualified, at the time he made his plea, he's only facing a mandatory minimum of 20 years. And there's no way he agrees to a binding agreement of 25 years if he's only facing 20 without any agreement whatsoever. This is a guy who had a 121 to 151 guideline range, and his prior convictions were so old that they qualified for zero criminal history points. And if you read the sentencing transcript, the district judge didn't like this agreement. There was just no reason for him to have agreed to it unless he thought that he was facing life. So that's why, just getting back to your question, the two Illinois ones are very relevant here. And I think that it's a clear, plain error under this court's recent decision in Najera-Rodriguez. And again, the government hasn't come forward with any other arguments against those two predicates. So unless this court has any other questions, I'll reserve my remaining time. All right. Thank you. Thank you, Ms. Eisman. Ms. Nelson? Good morning. May it please the court, my name is Kristen Nelson, and I represent the defendant appellant Maria Gonzalez. The district court erred as a matter of law when it applied the manager-supervisor enhancement to Ms. Gonzalez's sentence and committed clear error when the district court found that Ms. Gonzalez had managed or supervised three individuals without any evidence that they had the required knowledge of the criminal activity. At issue is whether Ms. Gonzalez's son, Freddy, his fiancée, Gloria, and Gloria's sister were criminally responsible for laundering money at the direction of Ms. Gonzalez. In its brief, the government makes the leap that because Ms. Gonzalez asked Freddy to wire money to Mexico in his name and that he did not want to wire the money, but eventually agreed to wire the money saying that he would not do it again and then made three additional transfers, this somehow made Freddy knowing of his actions being illegal. First, the sentencing court never made this conclusion. In fact, the sentencing court... Ms. Nelson, the argument that you are presenting here is different than the argument that was presented to the district court. The argument before the district court was about whether or not she supervised five participants. Right. And the district court ruled specifically on that, that the law doesn't require the actual supervision of five, it just requires five participating in the overall conspiracy. You are now arguing something different to us, that the one or more individuals who she did supervise according to the district court and the government weren't part of the conspiracy so they don't qualify. Given that you didn't raise that argument before the district court, why haven't you either waived or forfeited it before this court? Well, there appears to have been confusion at the district court where that was the focus on whether or not they were part of the five that were required under the guidelines. However, also required under the guidelines is that Ms. Gonzalez managed or supervised a knowing participant and there is nothing in the record that shows that the court made this factual determination that would have had the guidelines apply. Do you agree that that particular argument was never raised with the district court, namely that one of the individuals who she supervised actually participated in the conspiracy? It appeared that none of the parties addressed that, at most possibly forfeited. However, I believe based on just the overall confusion on the application of the guidelines, merits remanding this case back to the district court so that they can make a finding as to whether or not one of these three individuals were a knowing participant. Why wouldn't Ms. Gonzalez's statements, her post-Miranda statements, qualify or be enough for the court to find that her son, at least, was a participant in the conspiracy? Because she talked about in her post-statements, she changed her story a little bit as it went on, but she talked about how first he didn't want to send these wire transfers to a place in Mexico where they didn't have any family members, and then ultimately he said he would. Why wouldn't that provide sufficient evidence for a preponderance finding of that? Because I believe also in her statement, she stated that Freddie did not like Jose, her new boyfriend. There were allegations that there was a fight between Jose and, I believe, Ms. Gonzalez's ex-husband, that Jose saw. There were also statements made that Freddie saw Jose hold a gun to Maria's head. He simply didn't like Jose, so he didn't want any part of transferring money on behalf of Jose, regardless of what it was for. But there's nothing in the record that indicates that he knew that that was illegal or that what he was doing involved criminal activity. And it was common. Ms. Gonzalez did send money back to Mexico to her family, so she had had a history of doing that. But she didn't have a history of sending it to this particular place, and she didn't have any family members she admitted to the agent at this particular location. Correct. However, there's nothing in the record that indicates that Freddie had any knowledge that it was illegal or that it involved drug activity, and I believe the district court needed to make some type of finding that they were knowing participants, and it simply did not do that. So if the court has no further questions, I'll reserve 30 seconds for a rebuttal, but I would request that this case be remanded back to the district court for recess. Thank you. Mr. Tolliver. Good morning, Your Honors, and may it please the Court. My name is Terry Tolliver, and I represent Adrian Bennett in this matter. Mr. Bennett is seeking an additional downward departure pursuant to the sentencing factors outlined by 18 U.S.C. 3553A. We don't call these downward departures anymore. I'm sorry. That term went out the window with Booker. Mr. Bennett is seeking a re-sentencing pursuant to the 3553 factors, Your Honor. I'm sorry. You want a further downward variance. A further downward variance? Thank you. In the court's exercise of Booker discretion. That's how I understand your argument. It's one of substantive unreasonableness? Correct, Your Honor. And what we're. . . Ever held a below-guideline sentence substantively unreasonable? We would agree with the government's position that it would be, that generally it would be considered reasonable if it's a below-guideline sentence. But what we would turn the court to is the fact that in order to achieve the sentencing objectives, the court is to fashion a sentence that is sufficient but not greater than necessary. We know the legal standard. Yes. I'm asking you why should this case be the first in which we find a below-guideline sentence substantively unreasonable? What is unique about it? Mr. Bennett was 35 years old at the time of his sentencing. And what we are looking at based upon the 225 months that he was sentenced to is that this would place him in his 50s when he's released. Mr. Bennett's request to the trial court was 120 to 180 months, which would still place him in his mid-40s. There's no evidence that the additional 45 months, assuming the 180 at the maximum, would necessarily benefit Mr. Bennett or society. The district court considered that argument that was made about his age and his age upon release. How is it that you think the court abused its discretion in rejecting that? Well, here's why. First, the district court found that Mr. Bennett was remorseful, and he is remorseful. Mr. Bennett was also found that he needed rehabilitation for his drug addiction. There's no evidence before the trial court or this court that the additional time in prison would necessarily further benefit Mr. Bennett or otherwise make him more sober. More importantly, when you look at the United States Sentencing Commission statistics that were included in the sentencing memo, it concludes that younger offenders are more likely to reoffend than older ones. But based upon the sentence that Mr. Bennett had requested and the sentence that he ultimately received, it was less than a 0.6% difference, 13.9% based upon Mr. Bennett's request, 13.3% based upon what he was ultimately sentenced to. And when we're looking at statistics, more importantly, Mr. Bennett is being treated differently. The United States Sentencing Commission's 2017 data file stated that the average sentence for a drug trafficking offense in the Southern District of Indiana was 119 months. The national average is 75 months. But that doesn't say anything. If you're making a 3553A6 disparity argument, that data doesn't say anything about criminal history of the individual defendants who are reflected in there or other comparative factors. So how can you rely on a disparity argument on that statistic? Well, I think that you'd have to look at sentencing guidelines as a whole and what's the ultimate goal. And the ultimate goal would be to allow, to punish Mr. Bennett for his crime, but also ensure that he has sufficient time, that he serves sufficient time to be rehabilitated. And that not only includes ensuring that his drug addiction is resolved, but to also provide him an opportunity to make amends and continue to benefit society upon his release. And by allowing Mr. Bennett to leave sooner, this would provide more time for him to, again, be a more productive member of society. And that's what this court should consider. We're looking at a sufficient but no greater than necessary sentence for Mr. Bennett. In Mr. Bennett's case, that would be the 120 to 180 months that he's recommended to the court. If there are no further questions, I would ask that the remainder of my time be reserved for rebuttal. Thank you. All right. Thank you, Mr. Oliver. Mr. Hillis? Nothing to add, Your Honor. Thank you. Do you have anything to add at this point based on anything you've heard this morning? No, sir. Thank you for asking. All right. I'll ask you to stay with us, of course, until the conclusion of the argument. Yes, Your Honor. Ms. Karwosky? Good morning, Your Honors. May it please the Court, Lindsay Karwosky for the United States. I did want to make one correction with regard to my brief. When the government initially filed its brief, our failure to include Najera Rodriguez was initially an oversight. After that point, we were waiting to see whether or not the district court with that case sought review. At this point, we do concede that Najera Rodriguez is controlling. However, with that, we do still stand on our original positions on whether or not Chapman's convictions qualify to the extent necessary to preserve review. However, with Najera Rodriguez's case controlling his Illinois convictions, we do concede that they no longer qualify and then would, therefore, necessitate remand because the error would not be harmless in that case. With regard to the remaining arguments, I do have several points on rebuttal. With regard to starting with Mr. Rush's argument that the Indiana statute includes geometric isomers for methamphetamine, Mr. Rush's argument overlooks court precedent with regard to statutory construction. Specifically, the statutory construction that Taylor has mentioned, which is that statutory construction cannot dictate an implausible result. And what the defendant in Rush is requesting is just that. If the court were to read that the specific definition with regard to amphetamine, that is what they note in their brief, that amphetamine says salts, optical isomers, and salts of optical isomers means that using the general term isomers must mean geometric, then that would completely overlook the fact that later on when using fenfluramine, the Indiana statute says salts, optical, positional, or geometric isomers and salts of those isomers. If we follow Rush's argument and Chapman's argument with regard to methamphetamine, then it would cause superfluous language. Because in essence, what they're asking and what they're trying to tell the court is that when Indiana uses the word isomer, it must include geometric, if that's the case. This isn't unique to Indiana's definition, the Ninth Circuit's case in Lorenzo dealt with a California statute that's very similar, decided about a year ago. I'm sure this set off shockwaves within the Justice Department that there's going to be a mismatch between many state meth convictions and federal definition. Your Honor, the difference between Indiana and the Lorenzo case is that in the Lorenzo case, the California statute actually specifically defined isomer. Indiana does not specifically define isomer. In fact, what they do is they mirror the statute, the Controlled Substances Act, because with the Controlled Substances Act, methamphetamine is defined as salts, isomers, or salts of those isomers. Indiana defines it exactly the same way, salts, isomers, and salts of the isomers. And in fact, after that definition, it includes the DEA Controlled Substances Code number for methamphetamine, which further gives credence to the argument that Indiana is mirroring the Controlled Substances Act and is not, in fact, defining it more broadly. Additionally, Your Honor. Do you agree that under the Indiana statutes, meth should be defined the same for Mr. Rush's conviction as Mr. Chapman's conviction, given the different statutes? Your Honor, I do believe that the controlling question, regardless of the statutes that the defendants received convictions under, that the controlling question is how is methamphetamine defined in Indiana. And so, yes, I do agree that methamphetamine and how it is defined is the controlling question here. And the answer to that question is that Indiana does not define it more broadly. It does mirror the Controlled Substances Act. But Indiana defines isomer in a way that incorporates geometric isomers. I think I omitted a step. Indiana does not define isomer in the statute in any form. It defines methamphetamine, and the definition of methamphetamine is methamphetamine, its salts, isomers, or salts of its isomers. It does not include geometric isomers. The defendant's argument is that it does include geometric isomers because it is using a general term. But Indiana is using that general term because it is mirroring the Controlled Substances Act, which also says salts, isomers, and salts of isomers. So Section 3548.24 is not in play here in the Indiana Code? Your Honor, it... That says the term isomer includes the optical position and geometric isomers? Your Honor, that statute is with regard to hallucinogenic substances and not with regard to meth, so no, it does not control. It's not in play here? No, Your Honor. And my second rebuttal, if there are no further questions with regard to this particular topic, I would move on to then Ms. Gonzalez's argument with regard to the managerial enhancement. And as Judge St. Eve pointed out, that Ms. Gonzalez's own statements about Freddie's involvement is the reason for the managerial enhancement. She says that Freddie was criminally responsible in how he did the transfers. I would also point out defense counsel mentioned that Freddie could, the reason that Freddie did these transfers and didn't want to do them at first could have been because he didn't like Jose. And I would point the court to the fact that given two permissible views of the evidence, this court has already found that given two permissible views, that the court's decision between the two is not clearly erroneous. What specific statements of Ms. Gonzalez are you relying on for that argument? Your Honor, it would be her post-Miranda statements regarding the fact that she asked her son to make the transfers in his own name, that he initially did not want to do those transfers, and then subsequently decided to do a transfer and told her then he was not going to do another one. He then successfully committed three additional transfers. That by itself shows that he knew what he was doing was wrong. I think that circumstantially it shows that he knew what he was doing was wrong and that it was criminal. There was no other reason for him to say no. Additionally, Your Honor, other than the fact that he did not like to do those transfers, I would note that even though I think his relationship as well to Ms. Gonzalez is telling for his knowledge of the criminality, this entire organization was family-based. The two heads of the organizations were brothers. People routinely in criminal organizations, especially with drug trafficking, include their family members who are better to trust than family members. And in this case, Ms. Gonzalez chose her son to do her work because she trusted him. So I think that is another factor that shows that he knew the criminality. And again, Your Honor, with the fact that there are two permissible views and the court chose this one, it is not clearly erroneous. And if there are no further questions with regard to that argument, I would move on to Mr. Bennett's argument briefly and again reiterate what the court has already said this morning, which is that the court has never found that a below-guideline sentence is unreasonable. There is nothing that is unique about this particular case with Mr. Bennett. In fact, he is, out of the defendants that are appealing here today, he is the person that received the lowest sentence of any of the defendants. And his argument completely overlooks the fact that the Sentencing Commission, with the 3553A factors, have not only considered unwarranted disparities, but they've considered unwarranted similarities. And what the defendant is asking, Mr. Bennett is asking, is the court to disregard unwarranted similarities. He is not similarly situated to the people in the average case that they are citing with the statistics. It does not take into consideration, with the sentencing guidelines taken into consideration, the defendant as an individual and the fact that he had two prior felony convictions for drug offenses. He had two prior possession offenses for guns. And he had a larger role in the organization. He went straight to the source. So taking all of those things into consideration, the court weighed those and considered all of those as she laid out her sentence. And because of that, it was not substantially unreasonable. And based on all of those reasons, if there are no further questions, the government rests on its brief. Thank you, Ms. Galoisky. Ms. Masters. Just briefly, it appears the government is trying to rely upon legislative history without providing the court legislative history to support its arguments. We're relying on the general proposition of statutory interpretation regarding definitions that the general controls unless the specific is specified. This is a highly technical area where we're talking about chemical compounds. So it's hard to apply general rules of statutory interpretation such as words are given their common and ordinary meaning. It's hard to apply that canon of construction to the term isomer. But that's my understanding of your argument, that although the definition in the state statute and the federal statute, they're basically the same. But because the federal statute excludes geometric isomers, or more specifically includes only optical isomers from that, the failure of the Indiana Code to specifically exclude geometric isomers or limit the definition when meth is concerned to optical isomers means that it's broader. Is that? Essentially, because the federal government specifies optical isomers, and also that Indiana specifies different types of isomers when it means to. So we point out in our brief that the definition of amphetamine, which appears in the statute right before methamphetamine, specifies optical isomers. So our point is that the legislature does define the types of isomers when it chooses to do so, and it has not done so here. And as the Ninth Circuit recognized in the Lorenzo case after rehearing, if the statute, if the difference, the mismatch is apparent on the face, that's the extent of the analysis. And in this case, the mismatch is apparent on the face. Federal says optical. Indiana does not. Additionally, when Indiana wants to specify isomers, it does. So we do believe the general proposition of giving words their plain meaning and giving a word a broad meaning applies in this particular instance. And the Indiana term isomer has to be given its broadest possible scientific meaning. Because in the California statute, there was a further sub-definition that excluded. It didn't limit it to optical isomers. It made it clear that it was broader. We don't have that sub-definition here. Is that the distinction between Lorenzo and this case? We do not believe that that distinction matters, Your Honor. But there is a distinction. But there was a distinction. I will certainly concede that. The California statute did specifically say geometric isomers, and the Indiana does not. It uses the term isomers, which is still why we rely on the categorical approach and the plain difference in the language between the federal and the state statute. The state statute in Indiana is further refinement of what types of isomers it means, specifying isomers when it wants to. Well, let me put it this way. Would we be creating a circuit split with the Ninth Circuit if we ruled against you? I'm sorry, Your Honor? Would we be creating a circuit split if we ruled against you? Would you be creating a circuit split? Are the state statutory schemes specific enough or similar enough that a decision against you would create a circuit split on the mismatch between meth definitions in the state and federal codes? Your Honor, if I can answer that question in supplemental authority, I'd like to ask Mr. Chapman as well. Thank you. So we would ask that the pleas be vacated. All right. Thank you, Ms. Masson. Ms. Eisen? This was your part of the briefing. Maybe you have a position on whether we'd be creating a circuit split with the Ninth. Oh, I'm sorry. You would like me to answer that question? Okay. I think from Mr. Chapman's perspective, we can concede that you wouldn't because if you drafted your decision narrow enough to distinguish that statute because of the qualifier. Of course, I'm only speaking for Chapman on that. I do not want to prejudice Mr. Rush, and I can concede that because I believe that Mr. Chapman, in light of the government's concession, is entitled to have his plea vacated because of the Illinois. I could see a way. I think this court would need to have it narrowly drafted because, as Counsel for Rush pointed out, if you look at the Indiana statute, you really see that for amphetamine and methamphetamine, they're right next to each other. And for amphetamine, the statute specifically says optical isomers, and for meth it just says isomers. That's the definition I read earlier, I think. I'm sorry? That's the definition or sub-definition that I read earlier. Yes. And in other parts of the Indiana statute, it recognizes that there are other types of isomers, right? There's positional, there's geometric, and there's optical. So it's not like we're taking a word out of nowhere. In other parts of the statute, Indiana has said that these types of things exist. So you've got this very general term, isomer, and then right next to it you have a specific term. So because of that comparison, I think it's pretty clear that if Indiana had wanted to limit it to optical isomers, they would have done so. And so for that reason, I do think, as counsel said, it's very similar to Lorenzo. And the only difference is that in Lorenzo you had that specific sub-definition, but I think there's a clear case just looking at the plain language of the statute. So, like I said, from Chapman's perspective, I think we can make that concession because of what else he has going for him. But I stand here straight-faced saying that I truly believe, looking at that statute, it's very clear that the term isomer was meant to be more general for methamphetamine than it was for amphetamine. But, again, in light of the government's concessions, I would hope that this Court would accept that and vacate Mr. Chapman's plea and remand for further proceedings. Thank you. Ms. Nelson? There is simply no evidence in the record that any of these three individuals had criminal knowledge of the activity. They were never indicted. They never admitted, stated, nor indicated they knew of the illegal activity, and they simply were not aware. It is not up to the government to make this finding. It is up to the district court, and the district court never made this finding that they had the required knowledge. I would ask this case be remanded so the district court can make this factual finding and correctly apply the sentencing guidelines. Thank you. Thank you, Ms. Nelson. Mr. Toliver? Thank you, Your Honor. Your Honors, the guidelines are just one of a number of factors that this court, that the district court should consider when doing a sentencing. And when we look at the sentence that Mr. Bennett proposes of 120 to 180 months, it would also meet those other factors. It reflects the seriousness of the offense, provides just punishment, promotes respect for the law. And as we discussed earlier, this would provide the necessary deterrence because statistically the likelihood of him reoffending is greatly reduced, even under his reduced sentence. And this would also allow him to seek the treatment that he needs. And it's for those reasons that Mr. Bennett respectfully requests this court vacate his sentence of 225 months and remand the matter to the district court for re-sentencing. Such a decision will result in a sentence that is sufficient but not greater than necessary to achieve the sentencing purposes. Thank you. Thank you, Mr. Toliver. Mr. Hillis, anything further? No, Judge. Thank you very much. All right. Our thanks to all counsel. And I'd like to extend an additional thanks to Ms. Masters, Ms. Eisenman, Ms. Nelson, and Mr. Toliver for accepting the appointment in this case and ably representing your defendants. Case is taken under advisement and the court will proceed to the second case.